(PRIZE.)

The BOTHNEA and the JAHNSTOFF.

A question of collusive capture. Condemnation to the captors.

APPEAL from the circuit court for the district of Massachusetts.

From the papers found on board these vessels, and the preparatory examinations in the court below, it appeared that they were foreign vessels, having on board, as was admitted on all sides, false and simulated Swedish papers. They both sailed from Halifax, N. S., about the 24th of November, 1813, laden with cargoes of British manufactured goods, destined for the United States; and, on the same day, were captured near the Ragged Islands, either really or collusively, by the privateer Washington, of $24\frac{30}{95}$ tons, one gun and fifteen men, belonging to Portland,

in the District of Maine, and commanded by William Malcomb. They were taken in sight of each other; the Jahnstoff first, within about three hours, and the Bothnea, within about nine hours after leaving Halifax. At the time of the capture, there were on board the Bothnea seven persons, and on board of the Jahnstoff five persons, composing their respective crews, and one American passenger. The whole of the crews were taken from each vessel, and landed in a boat at Ragged Islands. The American passengers were retained on board, and under the superintendence of prize-masters and crews. The Bothnea was conducted into Salem, and the Jahnstoff into Plymouth, in the district of Massachusetts. Immediately on their arrival they were seized by the collectors of those ports, for an alleged violation of the non-importation act. Prize proceedings were also commenced by the captors against both vessels, before the district court of Massachusetts. The American passengers were examined on the standing interrogatories, and the papers found on board deposited in court by the prize-masters. The papers found on board the Bothnea were the Swedish simulated papers. Two bills of lading of the cargo, dated the 23d of November, 1813, purporting that the whole cargo was shipped by John Moody & Company, merchants, of Halifax, for New-London, consigned *to order*. A clearance from Halifax, dated on the same day. A British license from Sir John Sherbrooke, governor, &c., dated on the 9th of November, 1813, authorizing John Moody and others to export in any vessel, not belonging to France, to any port in the

United States, any British goods, on British or American account, which license was to continue in force for two months. And two letters dated at Halifax on the 23d November, 1813; one purporting to be addressed to the consignee of the cargo, the other to be addressed to the master of the Bothnea. These letters are as follows: "Halifax, November 23d, 1813. Dear Sir, We now only enclose you a bill of lading of the cargo shipped on our joint account per the Bothnea, agreeable to the memorandum left with us by Vandervel when last here. The invoices we forwarded in duplicate, one by P. Jones, and the other by Schonesburg, which you will have received before this. Z. has our particular instructions how to proceed when in with the squadron. We have settled for A.'s share of the compensation. B. 2. will pay his. We have fixed on 200 dollars, exclusive of the freight, which we have also arranged for. Most sincerely do we wish this speculation to succeed, at the same time request your earliest advice how to proceed with the next. Do not trust too much paper. We have directed Z., in case of meeting with an American cruiser, to destroy all. We are very truly your friends and obedient servants, John Moody & Company."

"Halifax, Nov. 23d, 1813. Captain J*. K*., Schooner Bothnea.—Sir, We hand you herewith sundry enclosures respecting the cargo of the Bothnea, to your most particular care. You will perceive the necessity of using every possible caution. We are only apprehensive of Shaving Mills. You will of course secrete every thing respecting the trans-

1817.

The
Bothnea and
Jahnstoff.

action. In case of British interruption we must recommend your being well assured that there is no deception, as you must be aware of the facility with which American cruisers may pass for English. The invoices of the goods are already forwarded. You will make the best of your way to N**. When in with any of the B. B. squadron, come forward with your Ex. Li. which will safely pass you, and then nothing will remain but activity and despatch in getting the goods on shore. We should not have embarked ourselves so largely in this concern, but from the ease with which dry goods can be smuggled into those places if properly managed. The bill of lading is to order, you will, therefore, receive instructions from our friends A. 1, and B. 2. We expect your best place will be to lay off under the protection of H. M. ships, and deliver the cargo in boats and lighters without proceeding further; and as our friends are already advised on the subject, no doubt every necessary step will be taken. Should, however, any unexpected casualty happen, we recommend your getting out of the way, as we would rather the whole should be sacrificed than any mischief happen to ——. But, above all, keep out of sight your Ex. Li. clearance and this letter. Do not confide too much. If you have any suspicions destroy all at once, and after committing this to memory be sure to put it perfectly out of danger. As to the return cargo we need not say any thing on the subject, having the fullest confidence that a voyage to St. Barts may be profitably effected with *certain* articles; flour out of the question, unless rye. B

No. 2, will pay you the compensation agreed, exclusive of the freight we have allowed. A.'s proportion we will settle with our own. If it is possible to obtain convoy we will, but it is doubtful. We are your friends and humble servants, John Moody & Co. P. S. Do not write, for fear of accidents. Let your communications be verbal."—The papers on board of the Jahnstoff were the Swedish simulated papers. A British license, and clearance, of the same date and purport as in the Bothnea. Two bills of lading of the cargo, dated the 23d November, 1813, on the same account, destination, and consignment as in the case of the Bothnea. And two letters dated at Halifax on the same day, one addressed to Messrs. B. 2, and A. 1, at New London; and the other to the master of the Jahnstoff. The first of these letters is as follows: "Halifax, Nov. 23d, 1813. Dear Sir, We now enclose you a bill of lading of the cargo shipped on our joint account per the brig Jahnstoff, agreeable to the memorandum left with us by Vandervelt, when last here. The invoice we forward 1 in duplicate, one by P. Jones, and the other by Schonesburg which you will have received before this. Z. has our particular instructions how to proceed when in with the Squad. We have settled for A.'s share of the compensation; B. No. 2, will pay his. We have fixed 200 dollars, exclusive of the freight, which we have also arranged for. Most sincerely do we wish this speculation to succeed. At same time request your earliest advice how to proceed with the next. Do not trust too much  per  We have directed Z., in case of meet-

ing with an American cruiser, to destroy all." The other letter is an exact transcript of that addressed to the master of the Bothnea, except that the direction is varied.

At the hearing in the district court, a claim was interposed by the District Attorney in behalf of the United States, and of the collector, praying a condemnation to them, upon the ground of a collusive capture and fraudulent breach of the non-importation act. That court dismissed the captor's libel, and condemned the vessels and their cargoes to the United States; from which sentence an appeal was interposed to the circuit court, which court affirmed the condemnation, and the causes were brought to this court by appeal. Farther proof was ordered at the last term, and the causes again came on for hearing at the present term upon the farther proof exhibited by both parties, and directed to explain the several points indicated by the court as grounds of doubt on the original evidence.[a] Under the commissions taken out to examine witnesses, the following interrogatories were exhibited on the part of the captors. Have not some of the privateers, fitted out in the eastern ports, during the war of the revolution and the late war, been of very small burthen? Was it not usual for these privateers, armed sometimes with one carriage gun only, to proceed coastwise upon short cruises, and did they not capture prizes of great value? Was it not their practice to frequent the ports of the District of Maine and of the province of

a See *Ante,* vol. I, p. 408.

Nova Scotia, for the purpose of running out occasionally, capturing the British commerce bound in and out of Halifax and other enemy's ports, and were they not often successful? Did it not often happen that the crews of the vessels, captured by them, were put ashore by the privateers, instead of being brought in as prisoners? Has it not been the practice for sea-faring persons in the District of Maine to become owners of such privateers, and to go in them on short cruises? Did it frequently happen during the late war that unarmed vessels, under neutral or British colours, sailed without convoy from the port of Halifax, either to New-London, Long-Island Sound, or elsewhere? And, on the part of the United States, the following: Was it not the usual custom, during the late war, for the owners of privateers to stipulate with the officers and crew, that the latter should receive one moiety or some other definite proportion of the proceeds of all prizes? Were there any cases where the crews were engaged to serve on monthly wages, without participating in the prizes? Was it not usual for privateers to bring in the prisoners captured by them? What was the usual and adequate crew and armament of a privateer of about 25 tons burthen, intended for a cruise from the eastern ports, in the Bay of Fundy and along the coasts of Nova Scotia? Together with other interrogatories tending to show, or to negative, collusion between the owners of the captured vessels and the privateer by which the capture was made. The answers to these interrogatories, by the various witnesses examined, were contradictory and incon-

1817.

The Bothnea and Jahnstoff.

sistent, and it would be obviously impossible to present any intelligible abstract of their testimony without extending the case to an inconvenient length. But, among other circumstances, it was proved that nine out of fifteen of the prize crew were joint owners.

Feb. 20th.

The causes were argued on the farther proof by Mr. *Harper* and Mr *Winder*, for the appellants and captors, and by the *Attorney-General*, for the United States.

March 4th.

Mr. Justice JOHNSON delivered the opinion of the court.

After duly weighing the evidence in these cases, a majority of the court are of opinion that the vessel and cargo must be adjudged to the owners, officers, and crew of the capturing privateer. Independently of the act of landing the entire crews of the captured vessels, there was nothing in the case which necessarily led to suspicion. And this is explained on a ground that is very plausible, to wit, that having a course to run which swarmed with enemy's vessels, their intention was to personate the original crew, and pass off the prizes on the approach of an enemy, under their original character. It is not at all impossible that nothing but this *ruse de guerre* may have been in contemplation of the crew. There is, indeed, something in it peculiarly characteristic, when we consider the spirit of adventure, and great mental resources which distinguish the people of whom the crew was composed. It is to

be regretted that this talent for enterprise had not been always more happily applied than it was in the adventure of the Jahnstoff and Bothnea. These vessels had both been employed in transporting provisions from New Haven to Halifax, and were now returning with cargoes of dry goods to be smuggled into the United States in the vicinity of the same place. The documentary evidence shows an intimate correspondence between the shippers at Halifax and some persons resident in the United States. But who they were must remain unknown, as the merchants in Halifax have, in their examination, refused to betray them. That the voyages of these vessels was loaded with infamy no one pretends to deny. The reasoning of the courts below is unanswerable on this point. But the majority of this court are of opinion that the evidence is not sufficient to fasten on the captors a participation in the fraud. The whole may have been, for aught we know, a combination of machinery, the result of the most consummate art. It is certainly true that, in one view of the case, every thing may be attributed to artifice, in another to natural conduct. Scarcely a feature of it may not be indifferently pronounced the lineament of guilt or innocence. In such a case a court of justice has no alternative. It must pronounce in favour of innocence.

The decrees below will, therefore, be reversed, and the vessels and cargoes adjudged to the captors.

Mr. Justice STORY gave no opinion.

Sentence reversed.